THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | 3:22-CR-199 |
| | : | (JUDGE MARIANI) |
| JAIRO BENJAMIN RIVERA-RAPOSO, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Defendant Jairo Benjamin Rivera-Raposo[1] was arrested on March 24, 2022, and charged with possession with intent to distribute cocaine on May 26, 2022. (Doc. 1.) Presently before the Court is Defendant's "Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment to the United States Constitution." (Doc. 24.) Defendant's Motion seeks to suppress the physical evidence gathered from his vehicle on the day of his arrest. (*See id.*)

 Defendant filed his Motion on July 26, 2022. (*Id.*) The Government filed its brief in opposition on September 22, 2022. (Doc. 43.) Following several continuances, this Court held an evidentiary hearing (the "Hearing") on July 25, 2023. Thereafter, the parties filed

_____

[1] Defendant's name is spelled differently in various documents of record, but in his *pro se* filings he spells his name "Rivera-Raposo." (*See, e.g.,* Doc. 39.) Therefore, the Court uses that spelling except when directly quoting.

post-hearing briefs.  (Docs. 56, 57.)  Defendant's Motion is now ripe for disposition, and for the reasons that follow, it will be denied.[2]

## II. FACTUAL BACKGROUND[3]

At the Hearing, Pennsylvania State Police ("PSP") Trooper Brian Konopka testified to his involvement in Defendant's arrest.  On the date in question, Konopka was assigned to the PSP's Safe Highway Initiative Through Effective Law Enforcement and Detection ("SHIELD") Unit.  (H.T. at 5:1–4.)  The SHIELD Unit operates to stop "crime in progress . . . through effectuating traffic stops."  (*Id.* at 5:7–15.)  Konopka testified that he has received over 600 hours of criminal interdiction training, covering topics including "drug trafficking, . . . courtroom testimony for narcotics cases, [and] cell phone-related investigations pertaining to drug trafficking investigations."  (*Id.* at 6:12–20.)  He has also received "specialized training" on "after-market hidden compartments," including their use by drug trafficking organizations, and on "[m]icro [e]xpressions and [h]uman [b]ehavior."  (*Id.* at 6:21–7:5.)  Konopka testified that he has participated in over 160 investigations related to drug trafficking and possession, and that over 100 of those were "significant drug investigations" involving a large quantity of drugs.  (*Id.* at 7:21–8:6.)

---

[2] The Court notes that Defendant is a citizen of the Dominican Republic who is subject to removal. (Doc. 56 at 2.)

[3] The Court bases the factual background on the "Mobile Video Recorder" (commonly referred to as "MVR" or "dash-cam") footage of the events of March 24, 2022 (Gov't Ex. A, hereinafter "MVR"), the parties' briefs, and the Hearing testimony.

Konopka testified that on March 24, 2022, at approximately 9:00 a.m., he was stationed on Interstate 380 in a marked patrol vehicle. (*Id.* at 8:19–9:3.) Konopka was conducting an instructional ride-along with PSP Trooper Robert Borkowski. (*Id.* at 4:23–25; Doc. 56 at 4.) Review of the MVR indicates that it was raining.

While observing northbound traffic, Konopka noticed a white Mazda SUV with a New York license plate pass by in the right lane. (H.T. at 11:6–9.) He observed that the vehicle appeared to have tinted windows, dark enough that he "couldn't see inside it," and was otherwise "plain," or free of other after-market modifications. (*Id.* at 11:10–14.)

Konopka testified that upon seeing the Mazda, he noticed by way of the license plate that it was newly-registered. (*Id.* at 13:11.) He had known at that time that New York was "on a K series for the license plate." (*Id.* at 11:12–13.) Because the Mazda's license plate began with "KTS," he knew it had been registered recently. (*See id.* at 11:13–14.) Konopka also testified that while he was "behind" the Mazda, before pulling it over, he ran the license plate and learned it was registered in the Bronx, New York. (*Id.* at 58:6–17.)

Konopka then pulled up alongside the Mazda to try to see inside before pulling the vehicle over. (*Id.* at 16:15–17:2; 18:23–25.) Once the vehicle was stopped, Konopka approached and engaged with the driver, notifying him that the vehicle's window tint was a violation under Pennsylvania law. (MVR at 1:20.) He asked the driver, ultimately identified as the Defendant, if he "dr[o]ve through Pennsylvania a lot." (*Id.* at 1:36.) Defendant said, "No, not Pennsylvania." (*Id.* at 1:38.) Review of the MVR indicates that Defendant's

Spanish accent was immediately apparent.  Konopka observed that Defendant was wearing scrubs.  (H.T. at 19:17–18.)

Konopka then asked for Defendant's driver's license.  (MVR at 1:40.)  Konopka testified that he "could immediately tell [Defendant] was having body tremors, meaning, his body was shaking, his arm was physically shaking, as he was going to hand me his driver's license."  (H.T. at 19:6–9.)  Defendant ultimately handed Konopka a "permit I.D. card," not a license.  (*Id.* at 19:9–13.)

As Defendant was searching for his license, Konopka asked where he was going. (MVR at 1:46.)  Defendant paused briefly before he said he was going to Syracuse.  (*Id.* at 1:52.)  Konopka testified that "he took a while to answer. It was a very simple question to ask him where he was going to, kind of, a delayed pause before he said, Syracuse."  (H.T. at 19:14–16.)  Konopka asked what he had "going on up there."  (MVR at 1:55.)  Defendant replied that he was going to see a "Covid patient" for "Covid tests."  (*Id.* at 1:57.)  He said, unprompted, that he was a phlebotomist and indicated that he had to travel to a patient in Syracuse.  (*Id.* at 2:03.)  Konopka noticed I.D. cards hanging from Defendant's rear-view mirror, one of which read "Phlebotomy."  (H.T. at 19:20–21.)  Konopka asked, "They're sending you to Syracuse?  What do you have to do?"  (MVR at 2:15–2:25.)  Defendant indicated that he administered at-home blood tests for Covid-19.  (*Id.*)

Konopka testified that he found this explanation suspicious.  He elaborated:

> To me, this was very suspicious -- a phlebotomist draws blood, he's taking a test, a blood test to test for COVID. Now, at this point, two plus years into

COVID, I had never heard of anybody taking a blood test to determine whether or not you had COVID. I've heard of a blood test to test for antibodies to see if you have the antibodies for COVID in your system, but his saying he was testing for blood made me very suspicious that somebody from New York City, who is a phlebotomist, would be traversing through New Jersey, Pennsylvania and upstate New York to take blood, to test for COVID, in Syracuse, which was a delayed response to my [question], when phlebotomists are throughout the entire country.

Even if it was legitimate that the CDC or whoever recommends that we can take a blood test to get a positive or negative result for COVID, why would a phlebotomist from New York City have to drive four or five hours away to upstate New York to take blood, when a phlebotomist from Syracuse could, potentially, be right there to take the blood.

So the entire concept of his story was very, very suspicious to me, that he would be driving, again, as I stated, in that manner, to go take blood for something I've never heard of being taken, to even indicate that you have a positive or negative result for COVID. So I was very, very suspicious of his reason and explanation for travel, coupled with the factors that I observed when the vehicle passed me, coupled with the fact that he's shaking and appeared nervous on the initial encounter.

(H.T. at 19:23–20:25.)[4]

At this point, the stop had lasted about two minutes. Konopka, who was leaning against the open passenger-side window throughout this interaction, leaned his head further through the window and asked, "Is that what that is?" (MVR at 2:25.) Konopka testified that he was asking about a large plastic bag sitting on the front passenger floor area. (H.T. at 21:10–16.) He explained:

[Defendant] kind of glanced over that, didn't say anything about that, he said, No. He shows me -- he gestures toward the back seat, and he rolls down his back passenger window.

_____

[4] With few exceptions, the Hearing testimony is transcribed directly without grammatical alterations.

When he rolled down the back passenger window, I saw two things immediately that furthered my suspicion. One, there was a Sharps container on the third row seat, more towards the driver side of the vehicle, the Sharps container was, I mean, I could imagine, several gallons, about this tall (indicating), and had tubes -- what I assumed would be the necessary tubes to draw blood from that appeared to have red blood in them, and they had been filled all the way to the top, almost overflowing out the top of the Sharps container.

On the second row seat, I saw a Husky bag, a brand name Husky bag, like, a tool bag that you would carry tools in, and that had vials in it that you would typically get when you would go to draw blood. So different color caps or whatever, I know, in the medical field, some of those signify different types of tests for the blood. So there was medical vials in the Husky bag that also had some tubes with blood and stuff sitting inside that.

That extremely raised my suspicion about the whole entire travel arrangement, that somebody from New York City is driving to upstate New York, as a phlebotomist, to take blood for COVID, something I had never heard of, in a completely unsanitary manner that you would bring a Husky bag with used needles and vials to go draw blood at somebody's house to test for COVID.

(*Id.* at 21:14–22:15.)  Not having received an answer about the black plastic bag, Konopka asked again, "What's all the black garbage bags?"  (MVR at 2:39.)  Defendant said, "Nothing, it's garbage," and moved it to the back seat.  (*Id.*; H.T. at 23:10–16.)

Konopka then asked Defendant for his registration and insurance, and if he had anything besides his driver's permit.  (MVR at 2:56–3:10.)  Upon realizing he had given Konopka his permit, Defendant retrieved his license and handed it to him.  (*Id.*)  Defendant did not provide his registration or insurance but began to look through his phone.  (H.T. at 25:11–14.)  Konopka testified that requesting registration and insurance was his standard procedure for traffic stops, but that in this case, he was "trying to establish whether or not he

actually owns this car" given that he had noticed it had "dealer tag[s]." (*Id.* at 23:22–24:3.)

He explained,

> A lot of times, with dealer registration plates and what we see with drug trafficking organizations, is, they're always using different manners of trying to maintain some sort of, if you want to say clandestinity [sic] to avoid police detection.
>
> So tactics can typically include fraudulent temporary registrations, temporary registrations, dealer tags, [and] transporter tags.

(*Id.* at 24:4–10.)

Next, Konopka returned to the topic of Defendant's job. He noticed a second work I.D. tag with a company name that was hanging from the vehicle's rearview mirror, and he asked Defendant if that was the company for which he worked. (MVR at 3:29.) Defendant, still looking at his phone, explained that he worked for "both companies," "Centers Lab and Alliance." (*Id.* at 3:34.) Konopka told Defendant that he did not understand his employment situation and asked whether he did house calls. (*Id.* at 3:43.) Defendant said he did. (*Id.* at 3:48.) Konopka asked whether "they always send [him] to upstate New York" (*id.* at 3:52), but Defendant's response was inaudible.

About five minutes into the stop, Konopka asked Defendant to exit the vehicle and accompany him back to the patrol car. (*Id.* at 5:00.) Konopka testified that at this point, he felt he had reasonable suspicion that Defendant was involved in criminal activity. (H.T. at 27:23–28:2.) He told Defendant that "as long as everything's good" he would give him a warning for the window tint violation. (MVR at 5:37.) He also asked for Defendant's mailing

address.  (*Id.* at 5:43.)  Konopka testified that he engaged in this conversation in an effort

"to bring down his anxiety level."  (H.T. at 32:24.)

Konopka then returned to Defendant's employment, asking, "So what company do

you work for?"  (MVR at 6:01.)  Defendant responded, "Let me show you the . . . " and

gestured with his hands.  (*Id.* at 6:07.)  Konopka asked if he had an "order for the work

you're doing today."  (*Id.* at 6:10.)  Defendant did not respond but walked back toward his

vehicle, and Trooper Borkowski followed.  (*Id.*)

When Borkwoski and Defendant returned, Borkowski explained that Defendant told

him he "doesn't have work orders specifically for today, he said they're confidential because

he's going to someone's house for a Covid test but that's the company he works for," and

handed Konopka a sheet of paper.  (*Id.* at 7:40.)  Konopka testified that the paper

referenced "Alliance Laboratories."  (H.T. at 34:16-20.)  Konopka asked Defendant whether

he typically travels for his work and why the at-home testing was necessary.  (MVR at 7:55–

8:33.)  Defendant answered that "sometimes" he goes to "Connecticut, all states."  (*Id.*)  He

explained that the at-home tests are for people who are old, who want privacy, or who have

money.  (*Id.*)

Next, Konopka asked how recently Defendant bought the Mazda.  (*Id.* at 8:38.)

Defendant said he bought it three months ago.  (*Id.* at 8:45.)  Konopka asked whether he

had any paperwork for the registration, because, he explained to Defendant, "when I run it

in my system, all I see is it's from the Bronx."  (*Id.* at 8:55.)  Defendant indicated that he was

given plates when he bought the car, but the seller had sent the registration to "[the

Department of] Motor Vehicles," so he had "to go there for the . . . new registration." (*Id.* at

9:00.)  At Konopka's request, Borkowski then went to the vehicle to record the VIN.  (*Id.* at

9:28.)

Konopka next asked whether Defendant bought the car in the Bronx, and Defendant

said, "No, no, no." (*Id.* at 9:40.)  But he proceeded to confirm that he did buy it in New York

and that the last owner was a woman in the Bronx.  (*Id.* at 10:10.)  Borkowski asked

Defendant if the vehicle was registered to him, and Defendant said, "Yes." (*Id.* at 10:25.)

After a pause, during which Konopka was presumably running a query on the

Mazda's VIN, Konopka asked Defendant again to explain how he got this license plate.  (*Id.*

at 10:50.)  Defendant said that he got the plate from a dealer, and it was "like a temporary

registration." (*Id.* at 10:55.)  Then he said that he bought it from a person, and that he had

the documents from her in the vehicle, "if you want to see." (*Id.* at 11:15.)  Konopka testified

that when he ran the registration,[5] he learned the Mazda had a temporary registration

belonging to Alpha Motors, a dealership on Jerome Avenue in the Bronx, New York.  (H.T.

at 28:6–19.)  Konopka testified that he was familiar with Jerome Avenue because it is a

"well-known area" associated with contraband.  (*Id.* at 29:6–30:3.)  He described it as a strip

---

[5] Konopka testified that he learned this by running the registration, but it seems more likely that he
ran the VIN, given that Defendant had not provided his registration.

of auto body shops that build after-market compartments in which to conceal contraband. (*Id.*)

Konopka then returned the conversation to Defendant's employer.  (MVR at 11:40.) He asked whether, if Konopka called them, Alliance Laboratories would confirm that Defendant was traveling to Syracuse that day.  (*Id.*)  Defendant briefly hesitated, and then nodded, saying, "Yeah."  (*Id.* at 11:46.)  He went on to advise that he was a vendor, and he offers to call the manager, who he says can explain.  (*Id.* at 11:54.)  Konopka asked more questions, trying to determine whether Alliance Laboratories is the vendor for whom Defendant works.  (*Id.* at 12:04.)  He told Defendant that he was familiar with the concept of vendors in the medical industry.  (*Id.* at 12:20.)  Defendant confirmed that Alliance Laboratories is the company "who calls [his] vendor," but that he works for "one guy."  (*Id.* at 12:55.)  Then he provided a woman's name as the "contact" but said "Randy" makes the schedule.  (*Id.* at 13:10.)  Konopka inquired further, asking whether Defendant filed taxes and who he "file[s] [his] W-2 from"—to which Defendant replied that he files a W-9.  (*Id.* at 13:47.)  He then asked how long Defendant had been working for this company.  (*Id.*at 14:00.)  Defendant responded, "For this company, um, three months.  For the other company, three years."  (*Id.* at 14:05.)  When Borkwoski tried to clarify the company to which he is referring, Defendant said, "I don't know, the name is Mark."  (*Id.* at 14:20.)

Konopka testified to the factors contributing to his suspicion at this point:

So, I mean, even right there . . . -- he starts off by saying he works for two different companies, then, he provides me with the Alliance sheet, but then

back tracks from the Alliance sheet, he just gave three different people's names of who he works for, he can't tell me whose name or what company is on the W-9.

He is somebody who is supposed to be in the health care industry, driving across multiple states, he actually said he works in all 50 states in the United States, but can't tell me who he works for, can't tell me, exactly, where he's going. When I asked him where he's going, major think space, takes a while to answer, says, Syracuse.

While I'm sitting in this car, I actually run a license plate reading[] to see for the last several weeks prior to this trip, his vehicle was observed on I-90 Westbound going into Rochester over the two or three weeks prior to this. So I have every inclination that he's not going to Syracuse, he more than likely is traveling to that Rochester area.

So I have all the factors I mentioned from pre-stop observations, the window tint, the registration being newly-registered. I stop the car, the nervous behavior, how he was shaking inside the car. I don't have any documentation and no knowledge as to who this vehicle belongs to. We get the VIN back for the car, comes back to a female in the Bronx, which he doesn't even want to tell me about until I'm running it, physically. He could have just told me who it belonged to. The dealer tag and how that's used.

No idea who he's working for. Unsanitary conditions with Sharps containers, full of used needles with blood in them. We have vials sitting inside a Husky bag that also has used needles. We have a garbage bag that he completely ignores to me asking him about what that's related to, then, when I asked him a second time, he throws it in the back of the car. We have Jerome Avenue in the Bronx, we have highly-traveled route going on I-380 to upstate New York, and just the entire vagueness, and you should know who you work for, at the end of the day.

(H.T. at 39:20–41:5.)

After about fourteen minutes, Konopka asked Defendant if there were any narcotics or other drugs in the vehicle. (MVR at 14:30.) Defendant said no. (*Id.*) When Konopka asked if he could search the vehicle, Defendant responded, "Yeah, but I don't know what

happened." (*Id.* at 14:50.)  After some confusion regarding whether Defendant understood the request for consent and whether he in fact consented to a search, Konopka stated that he was interpreting their conversation as a denial of consent.  (*Id.* at 22:02.)  Konopka requested a PSP canine unit about 24 minutes into the stop.  (*Id.* at 24:48.)  Defendant agreed to allow the canine search.  (H.T. at 44:4–7.)

A PSP canine unit arrived, and the canine ultimately alerted to the presence of narcotics inside the Mazda.  (*Id.* at 44:10–12.)  A subsequent state search warrant resulted in the seizure of approximately 4.5 kilograms of cocaine.  (*Id.* at 44:13–23.)  The case was thereafter adopted for federal prosecution, and on March 22, 2022, Defendant was indicted by a federal grand jury and charged with one count of possession with intent to distribute 500 grams and more of cocaine, in violation of 21 U.S.C. § 841(a) and (b)(1)(B).  (Doc. 1.)

### III. LEGAL STANDARD & ANALYSIS

Defendant argues the evidence gathered from the Mazda should be suppressed because the traffic stop was unlawfully extended "almost immediately" and Konopka diverted from the traffic stop's mission into a criminal investigation "prior to the existence of reasonable suspicion." (*See* Doc. 57 at 6.)  The Government contends that any deviation from the mission of the traffic stop was supported by reasonable suspicion and was therefore lawful.  (*See* Doc. 56 at 15.)  Because Konopka had reasonable suspicion of criminal activity before he measurably extended the stop, no Fourth Amendment violation occurred.

### A. Fourth Amendment

The Fourth Amendment provides that individuals shall not be subject to "unreasonable searches and seizures." U.S. Const. amend. IV. "[A] defendant who challenges a search or seizure typically bears the burden of proving that it was illegal." *United States v. Headen*, 264 F. App'x 244, 246 (3d Cir. 2008). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). Here, because the seizure at issue occurred without a warrant, the Government bears the burden of demonstrating reasonableness. *See United States v. Clark*, 902 F.3d 404, 409 (3d Cir. 2018) (first citing *United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013); then citing *United States v. Coward*, 296 F.3d 176, 179 (3d Cir. 2002); and then citing *Johnson*, 63 F.3d at 245) ("The Government bears the burden of showing (and presenting evidence) that the traffic stop was reasonable.").

"Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). "A well-established exception to the Fourth Amendment's warrant requirement permits an officer to 'conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). "While

'reasonable suspicion' is a less demanding standard than probable cause and requires a

showing considerably less than preponderance of the evidence, the Fourth Amendment

requires at least a minimal level of objective justification for making the stop." *Wardlow*, 528

U.S. at 123.  Moreover, to lawfully conduct an investigatory or "*Terry* stop," an officer must

be able to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of

criminal activity." *Id.* (citing *Terry v. Ohio,* 392 U.S. 1, 27, 28 (1968)).

> As explained by the Supreme Court in *Kansas v. Glover*, reasonable suspicion

> "can be established with information that is different in quantity or content than
> that required to establish probable cause." *Alabama v. White*, 496 U.S. 325,
> 330, 110 S. Ct. 2412, 110 L.Ed.2d 301 (1990). The standard "depends on the
> factual and practical considerations of everyday life on which reasonable and
> prudent men, not legal technicians, act." [*Navarette v. California*, 572 U.S. 393,
> 402 (2014)] (quoting *Ornelas v. United States*, 517 U.S. 690, 695, 116 S. Ct.
> 1657, 134 L.Ed.2d 911 (1996) (emphasis added; internal quotation marks
> omitted)). Courts "cannot reasonably demand scientific certainty . . . where
> none exists." [*Wardlow*, 528 U.S. at 125]. Rather, they must permit officers to
> make "commonsense judgments and inferences about human behavior." *Ibid.*;
> *see also Navarette*, *supra*, at 403, 134 S. Ct. 1683 (noting that an officer "'need
> not rule out the possibility of innocent conduct'").

—— U.S. ——, 140 S. Ct. 1183, 1187–88, 206 L.Ed.2d 412 (2020).  Stating that Supreme

Court "precedents . . . repeatedly affirmed that the ultimate touchstone of the Fourth

Amendment is reasonableness," the Court emphasized that "[t]he standard takes into

account the totality of the circumstances—the whole picture." *Id.* at 1191 (internal

quotations and citations omitted).

> By adopting a "totality of the circumstances" approach, the Supreme Court has

rejected a "divide-and-conquer analysis." *United States v. Arvizu*, 534 U.S. 266, 274

(2002). Instead, "the whole picture must be taken into account," *United States v. Cortez*, 449 U.S. 411, 417 (1981), and although any single factor may not "by itself [be] proof of any illegal conduct," and may in fact be "quite consistent with innocent travel," considered together, the factors may amount to reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1 (1980). Finally, courts "afford significant deference to a law enforcement officer's determination of reasonable suspicion." *United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018).

As Defendant argues here, even if a traffic stop is initially supported by reasonable suspicion, its extension may render it unlawful. The Third Circuit addressed specifically the permissibility of the extension of a traffic stop in *United States v. Hurtt*, 31 F.4th 152, 159 (3d Cir. 2022). The *Hurtt* court first noted that "[e]ven if an officer lawfully stops a suspect at first, 'it could become "unreasonable," and thus violate the Constitution's proscription [against unreasonable searches and seizures], at some later time.'" 31 F.4th at 159 (quoting *Clark*, 902 F.3d at 409). The court then looked to *Rodriguez v. United States,* where

> the [Supreme] Court held that "a police stop exceeding the time needed to
> handle the matter for which the stop was made violates the Constitution's shield
> against unreasonable seizures." [575 U.S. 348, 350 (2015).] Thus, "a seizure
> justified only by a police-observed traffic violation, . . . becomes unlawful if it is
> prolonged beyond the time reasonably required to complete the mission." [*Id.*
> at 350–51.]

*Hurtt*, 31 F.4th at 159.[6]

"An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (citing *Rodriguez*, 575 U.S. at 355). The *Green* court explained that, pursuant to *Rodriguez*, "we must first determine when the stop was measurably extended. . . . After determining when the stop was extended—the '*Rodriguez* moment,' so to speak—we can assess whether the facts available to [the officer] at that time were sufficient to establish reasonable suspicion." *Id.* After the *Rodriguez* moment,

> "nothing later in the stop can inform our reasonable suspicion analysis." [*Green*, 897 F.3d at 182.] In short, we ask whether the mission of the traffic stop was continuously carried out before the discovery of evidence giving rise to a reasonable suspicion of criminality. Any break in that mission taints the stop because it is the result of an unreasonable delay. [*See, e.g.*, *United States v. Garner*, 961 F.3d 264, 271–72 (3d Cir. 2020) (holding that there was no unlawful extension of the traffic stop because the officer "had reasonable suspicion to extend the stop based on information he obtained during the first few minutes of the traffic stop"); *Yoc-Us v. Att'y Gen.*, 932 F.3d 98, 105–06 (3d Cir. 2019) (holding that the officer was justified for first stopping the van for speeding but that it was an unlawful extension to investigate the immigration status of the passengers); *Clark*, 902 F.3d at 410–11 (questioning the passenger after receiving information from dispatch impermissibly extended the stop because the traffic stop's mission "to address the traffic violation that warranted the stop" was complete).]

*Hurtt*, 31 F.4th at 159.

---

[6] Citations footnoted in *Hurtt* are bracketed in this opinion.

Importantly, when it comes to inquiries unrelated to the traffic stop, "there is no *de minimus* exception to" the *Rodriguez* rule. *Clark*, 902 F.3d at 410 (citing *Rodriguez*, 575 U.S. at 357). In describing what inquiries qualify as unrelated to a traffic stop, *Rodriguez* noted that ordinary inquiries "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. The Third Circuit has further held that "some questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop, as do delays caused by safety concerns related to the stop." *Garner*, 961 F.3d at 271 (citing *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003); *Clark*, 902 F.3d at 410).

"In performing these on-mission tasks, '[o]fficers should be reasonably diligent,' and 'the best indication of whether an officer has been reasonably diligent is by noting what the officer actually did and how he [or she] did it.'" *Hurtt*, 31 F.4th at 160 (quoting *United States v. Yusuf*, 993 F.3d 167, 182 (3d Cir. 2021) (internal quotation omitted)). As stated in *Garner*, "[t]o lawfully extend a stop beyond when tasks tied to its initial mission are completed or reasonably should have been completed, an officer must have an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring." 961 F.3d at 271 (first citing *Rodriguez*, 575 U.S. at 355; and then citing *Clark*, 902 F.3d at 410). If the officer possessed reasonable suspicion of criminal activity prior to extending the traffic stop, no violation of the Fourth Amendment has occurred. *See id.*

17

When reviewing the allegation that a traffic stop was improperly extended, a court is to "review objectively the officer's rationale, by looking to the facts and circumstances confronting him or her, to determine whether his or her actions during the stop were reasonable." *Clark*, 902 F.3d at 409 (citing *United States v. Delfin-Colina*, 464 F.3d 392, 397–98 (3d Cir. 2006)).

### B. Analysis

Here, Defendant does not challenge the initial stop[7]—he argues only that the stop was unlawfully extended without reasonable suspicion.  But Konopka testified to several factors that contributed to his suspicion within the first few minutes of the stop before he extended it by expanding his questioning into details about Defendant's employment. These factors amounted to reasonable suspicion when considered in totality.  Accordingly, because Konopka had reasonable suspicion of criminal activity before he deviated from the traffic-based mission of the stop, no Fourth Amendment violation occurred, and the evidence resulting from the stop will not be suppressed.

---

[7] Defendant describes the initial stop as "of dubious origin but none the less lawful." (Doc. 57 at 13 (quoting *United States v. Horsford*, No. 3:21-CR-243, 2022 WL 2177447, at 10 (M.D. Pa. June 16, 2022)).) He argues, however, that the "pretextual" nature of the stop is "relevant in determining whether Trooper Konopka complied with the law in conducting an on-mission traffic stop before he acted on his hunch and initiated a drug investigation." (*Id.*)  He argues further that "Konopka's preconceived notion, or informed hunch, that the vehicle contained contraband is important to consider in assessing whether he jumped the gun and launched a drug investigation without first conducting a traffic stop as mandated by *Rodriguez* and its progeny." (*Id.*)

### 1. *Rodriguez Moment*

First, the Court must determine if and when the traffic stop was measurably

extended. *See Green*, 897 F.3d at 179. The Government asserts that there was arguably

no *Rodriguez* moment until Konopka asked whether there were drugs in the vehicle. (Doc.

56 at 15.) Nonetheless, the Government argues that Konopka had reasonable suspicion

much earlier, "[w]ithin moments of the traffic stop" and certainly by the time Defendant was

asked to exit his vehicle. *Id.* Defendant argues the *Rodriguez* moment was as early as "a

little over a minute into the stop when Trooper Konopka conducted what amounted to an

illegal search" of the Mazda. (Doc. 57 at 14.) Defendant identifies the earliest *Rodriguez*

moment to be "a little over a minute into the stop when Trooper Konopka conducted what

amounted to an illegal search of Mr. Rivera-Raposa's vehicle" (Doc. 57 at 14), specifically

identifying 1:39 on the MVR when Konopka "sticks his head deep into the passenger-side

window of the vehicle" (*id.*). Defendant also contends that, "[a]t the very latest," the

*Rodriguez* moment occurred when Defendant was directed out of the vehicle to the side of

the patrol car. (*Id.* at 17–18.)

The Court first notes that Defendant never presented any valid registration or

insurance information throughout the course of the stop. It is well-settled that ordinary

traffic-related inquiries include "inspecting the automobile's registration" and requesting

"proof of insurance." *Rodriguez*, 575 U.S. at 355. Until it became clear that the Troopers

were no longer interested in these documents,[8] locating the registration and insurance information remained a basic and necessary element of the traffic stop that had not yet been resolved.  However, an officer might unlawfully deviate from a traffic stop's mission before that mission has been completed.  *See Hurtt*, 31 F.4th at 159 ("[W]e ask whether the mission of the traffic stop was continuously carried out before the discovery of evidence giving rise to a reasonable suspicion of criminality. Any break in that mission taints the stop because it is the result of an unreasonable delay.").  It is not dispositive, then, that Defendant's insurance and registration were never provided.

The Court concludes that, based on a deviation from the traffic stop's mission, the earliest the *Rodriguez* moment occurred was when Konopka's questioning shifted in focus from Defendant's immediate travel plans to Konopka's subsequent more specific questioning about Defendant's work.  As set out above, questions regarding travel plans are within the scope of a traffic stop.  *See Garner*, 961 F.3d at 271 (citing *Givan*, 320 F.3d at 459; *Clark*, 902 F.3d at 410). Importantly, where a defendant relates his travel plans to his work, the stop has not gone off mission but, arguably, may do so upon further questioning about employment.  *See United States v. Washington*, No. 3:20-CR-00047, 2021 WL 1588971, at *12 n.7 (M.D. Pa. Apr. 22, 2021).

_____

[8] While standing at the side of the patrol vehicle discussing his vehicle's registration, Defendant appears to offer to check whether a certain document—perhaps his registration—is in the vehicle, but Borkowski instructs him to remain where he is.  (MVR at 10:05.)

Here, Defendant said he was traveling to Syracuse, and when Konopka asked,

"What you got going on up there?" Defendant related his travel to his work and volunteered

additional information about the reason for his work travel.  (MVR 1:44-2:13.)  That

information included that Defendant was a phlebotomist going to Syracuse to give patients

COVID tests.  *See supra* p. 4. The Court concludes that Konopka's question about what

Defendant had going on in Syracuse was sufficiently related to travel plans to be considered

within the scope of the traffic stop.  *See Garner*, 961 F.3d at 271.

Whether follow-up inquiries are sufficiently related to travel to be considered on

mission is a closer call.  *See Washington*, 2021 WL 1588971, at *12 n.7.  After Defendant

volunteered information that he was a phlebotomist traveling to give COVID tests, Konopka

asked, "They Send you to Syracuse? . . . What do you have to do?" (MVR 2:14).   The Court

concludes that these questions are arguably off mission because they shift the focus from

travel plans to employment concerns.  Therefore, the Court will consider this the earliest

possible *Rodriguez* moment and will turn to the question of whether Konopka had

reasonable suspicion to continue the stop at that point.

## 2.  *Reasonable Suspicion*

The extension of the stop beyond the *Rodriguez* moment was unlawful only if not

supported by reasonable suspicion.  Here, when considered in totality, factors articulated by

Konopka contributed to the formation of reasonable suspicion before the earliest possible

*Rodriguez* moment identified above.

By 2:14 on the MVR, Konopka had established reasonable suspicion to extend the stop.  The following factors identified by Konopka together formed reasonable suspicion: (1) the Mazda's dark window tint; (2) Defendant's travel on a known drug trafficking corridor; (3) Defendant's vehicle was newly registered; (4) Defendant's vehicle was registered in the Bronx; (5) Defendant's nervous behavior, including his physical shaking; (6) Defendant's delayed response to simple travel questions about his destination; and (7) Defendant's information about the reason for his travel.  (Doc. 56 at 16.)

Many of these factors have previously been held to contribute to reasonable suspicion in combination with other indicators of criminal activity.  First, Defendant's tinted windows were a valid indicator of criminal activity.  To begin with, excessive window tint is independently unlawful under the Pennsylvania Vehicle Code.  75 Pa. C.S.A. § 4524(e)(1).  More to the point, Konopka testified to a belief, based on his training and experience, that tinted windows are often associated with drug trafficking and the presence of hidden compartments because the dark windows "protect [the] view inside the vehicle."  (H.T. at 11:15–12:4.)  Other courts have credited such testimony as contributing to reasonable suspicion.  *See, e.g., United States v. Stanger*, No. 4:21-CR-00264, 2023 WL 1071648, at *5 (M.D. Pa. Jan. 27, 2023) (slip op.) (officer's belief that "excessive window tint is a common indicator of vehicles used to transport contraband" contributed to reasonable suspicion); *United States v. Meran*, No. CR 16-222, 2017 WL 4803927, at *3 (W.D. Pa. Oct. 23, 2017) (same).

22

Konopka also noted that the combination of the tinted windows and the lack of any other after-market modifications raised his suspicion, but the Court gives this factor very little weight. (*See* H.T. at 12:25–13:10 (noting "it does not make sense for a drug trafficking organization to put bright, shiny rims on a vehicle and dump money into a vehicle that's going to be used as part of a drug trafficking organization that could, potentially, draw attention from law enforcement . . . , or . . . could possibly be seized").) To be sure, this conclusion, based on Konopka's experience and extensive training in criminal interdiction, is afforded deference. *See Foster*, 891 F.3d at 104. But the Court agrees with Defendant that "the vast majority of vehicles on the road have no 'aftermarket' modifications." (Doc. 57 at 21 (citing *United States v. Vazquez-Pagan*, No. 3:22-CR-170, 2022 WL 17960771, at *7 (M.D. Pa. Dec. 27, 2022)).) As such, this factor moves the needle only slightly.

Second, travel on a known drug corridor is frequently cited by law enforcement officers as contributing to suspicion. *See, e.g., Meran*, 2017 WL 4803927, at *3 ("Interstate 80 is a known major drug corridor."); *United States v. Langley*, No. 3:15-CR-155, 2017 WL 4444208, at *6 (M.D. Pa. Oct. 5, 2017) (describing I-80 as a "a well-known drug corridor for illegal narcotic transportation"); *Garner*, 961 F.3d at 272 (defendant's travel on I-81, a "drug trafficking corridor," contributed to reasonable suspicion).

Third and fourth, that Defendant's vehicle had been recently registered, and registered in the Bronx, raised Konopka's suspicion. Konopka testified that "the overwhelming majority of [his] drug trafficking investigations have newly-registered license

plates." (H.T. at 15:4–6.)  He explained that drug trafficking organizations often re-register vehicles because they are aware that law enforcement uses license plate readers.  (*Id.* at 14:20–15:6.)  As Konopka testified, re-registering makes it harder to track a vehicle that might have been known to law enforcement for containing an illegal compartment or being otherwise associated with drug trafficking.  (*See id.*)

Fifth and sixth, Konopka testified that he observed several nervous behaviors, including physical shaking and Defendant's delayed response to simple questions.  It is well settled that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."  *United States v. Nelson*, 284 F.3d 472, 477 (3d Cir. 2002) (quoting *Wardlow,* 528 U.S. at 124).  Defendant argues that "little weight can be placed on the assertion that Mr. Rivera-Raposa was unusually nervous" because the MVR at 5:07 through 5:30 shows Defendant "not shaking" and "calm[]."  (Doc. 57 at 20.)

Regarding Defendant's response to simple questions, his delay in answering Konopka's inquiries about his destination is corroborated by the MVR at 1:42-1:52.  Further, Defendant's reliance on the time he allegedly appeared calm on the MVR does not contradict Konopka's testimony.  During that time, Defendant exits the vehicle, walks to the passenger side of the Trooper's car, and rests his folded arms on the car door.  The camera angle, Defendant's movement, and Defendant's posture at the side of the vehicle do not demonstrate shaking.  However, a brief period which does not demonstrate visible shaking does not undermine Konopka's assessment in that the MVR did not capture Defendant's

behavior or mannerisms inside the Mazda before he came back to the patrol vehicle. The MVR confirms Konopka's on-scene assessment of Defendant's demeanor while in his vehicle as Konopka can be heard commenting "he's shaking, what's going on with this guy" when Konopka first returns to the patrol vehicle and Defendant is going to the passenger side of the vehicle as directed. (MVR at 5:24.) Finally, The MVR also shows Defendant's left hand shaking at points when he is standing at the side of the patrol car. (MVR at 8:16, 8:23.) While Defendant's shaking at this later point in time does not contribute to Konopka's earlier formation of reasonable suspicion, it informs the Court's analysis as to Konopka's credibility with respect to his testimony about the earlier shaking.

Finally, the seventh factor carries significant weight in the Court's finding of reasonable suspicion. Konopka testified extensively that he found Defendant's explanation for his travel highly suspicious. Konopka was almost immediately skeptical for two reasons. First, he testified, "at this point, two plus years into COVID, I had never heard of anybody taking a blood test to determine whether or not you had COVID." (H.T. at 19:25–20:2.) Second, traveling such a distance to conduct a Covid test seemed illogical. He explained:

> Even if it was legitimate that the CDC or whoever recommends that we can take a blood test to get a positive or negative result for COVID, why would a phlebotomist from New York City have to drive four or five hours away to upstate New York to take blood, when a phlebotomist from Syracuse could, potentially, be right there to take the blood.

(*Id.* at 20:11–16.)

25

Regardless of whether Konopka's observations were factually correct, the Court finds them unquestionably reasonable. As of 2:14 on the MVR, the *Rodriguez* moment, Konopka knew that Defendant was a phlebotomist traveling to Syracuse to give COVID tests. *See supra* p. 21. His determination that Defendant's explanation of his travel plans was highly suspicious, based on both his common sense and his training and experience in the field, is thus afforded deference. *See Foster*, 891 F.3d at 104; *Glover*, 140 S. Ct. at 1188. An officer's disbelief or confusion regarding travel plans frequently contributes to findings of reasonable suspicion. *See Green*, 897 F.3d at 185 ("statements concerning [defendant's] travel were sufficiently confusing so as to meaningfully contribute to reasonable suspicion") (citing *Benoit*, 730 F.3d at 285–86); *United States v. Robinson*, 529 F. App'x 134, 138 (3d Cir. 2013) ("unusual explanation of [defendant's] travel plans" contributed to reasonable suspicion); *United States v. Wilkenson*, No. 3:22-CR-113, 2023 WL 5103364, at *9 (M.D. Pa. Aug. 9, 2023) (slip op.) (same). As in *Green*, the Court finds that this factor contributed "meaningfully" to Konopka's suspicion, 897 F.3d at 185, because of the extent to which Defendant's purported reason for travel was inconsistent with Konopka's experience and common sense.

In sum, the seven factors discussed above support the conclusion that reasonable suspicion existed prior to the earliest possible *Rodriguez* moment which the Court has identified at 2:14 on the MVR. Thus, to the extent questioning of Defendant beyond that

point deviated from the stop's mission, the deviation was supported by reasonable suspicion

and the extension of the stop was lawful.

With this conclusion, the Court has considered and rejected Defendant's argument

that reasonable suspicion did not exist before he was instructed to leave his car.  (*See* Doc.

57 at 14-22.)   Defendant's contention that the stop became unlawful "a little over a minute

into the stop when Trooper Konopka conducted what amounted to an illegal search of Mr.

Rivera-Raposa's vehicle" (Doc. 57 at 14) and that nothing later in the stop can inform the

reasonable suspicion analysis (*id.* at 16) is without merit.

Defendant is correct that after the *Rodriguez* moment, "'nothing later in the stop can

inform our reasonable suspicion analysis.'" (Doc. 57 at 16 (quoting *Hurtt*, 31 F.4th at 159).)

Defendant is also correct that the Supreme Court has held that the interior of a vehicle is

subject to Fourth Amendment protection from "'unreasonable intrusions by the police.'"

(Doc 57 at 15 (quoting *New York v. Class*, 475 U.S. at 106, 114-15 (1986)).)   However,

Defendant is incorrect that an unreasonable intrusion occurred before the *Rodriguez*

moment in this case and that reasonable suspicion did not exist before the *Rodriguez*

moment.

In support of his position, Defendant cites *New York v. Class*, 475 U.S. 106 (1986),

and *United States v. Montes-Ramos*, 347 F. App'x 383, 389–90 (10th Cir. 2009).  (Doc. 57

at 15.)  In *Class*, an officer reached into the interior of a vehicle to move some papers in

order to read the VIN and observed a gun protruding from under the passenger seat.  475

U.S. at 111.  The Supreme Court held that while a car's interior does not provide the same expectations of privacy that one enjoys within one's home, "as a whole [it] is nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the police."  *Id.* at 114–15.  It held further that "the intrusion into that space constituted a 'search'" under the Fourth Amendment.  *Id.*  However, in part because a driver has no reasonable expectation of privacy in his VIN, the court held the search was "sufficiently unintrusive to be constitutionally permissible."  *Id.* at 119.

In *Montes-Ramos*, the Tenth Circuit "considered whether an officer's intentional act of minimally intruding the air space of a lawfully stopped vehicle for an investigatory purpose constitutes a search within the meaning of the Fourth Amendment."  347 F. App'x at 388.  The facts, however, were unique:  While the officer waited for the defendant to produce his license, "he observed suspect objects in the backseat and leaned his head approximately two inches into the car window and sniffed."  *Id.*  It was apparently undisputed that he did so to confirm his suspicion that the "suspect objects" were in fact packages of marijuana.  *Id.*  The court held the officer's act of leaning his head in and sniffing constituted a Fourth Amendment search.  *Id.* at 390.  Because the officer lacked probable cause for the search,[9] the court held it was unreasonable and accordingly suppressed the fruits of the "sniff search."  *Id.* at 393–94.

---

[9] The court concluded it could not find probable cause had been established because the Government had waived its argument in support of such a finding.  *Montes-Ramos*, 347 F. App'x at 393–94.

The *Montes-Ramos* court cites *United States v. Ryles*, 988 F.2d 13, 14 (5th Cir. 1993).  In *Ryles*, testimony from the district court's suppression hearing indicated that the officer either opened a car door and stuck his torso inside the defendant's vehicle or stuck his head through an open window.  *See id.* at 15 n.4.  The officer smelled marijuana inside the car, but unlike in *Montes-Ramos*, it is not suggested that his intention was to "sniff search" the vehicle.  *Cf. Montes-Ramos,* 347 F. App'x at 388.  The Fifth Circuit held, first, that committing either one of these acts constituted a Fourth Amendment search because the officer "intruded inside a space that, under most circumstances, is protected by a legitimate expectation of privacy."  *Ryles*, 988 F.2d at 15.  However, because of "the reason behind [the officer's] actions," the court held the search was not unreasonable so as to violate the Fourth Amendment.  *See id.*  The officer was faced with a van full of passengers, the initial driver of which was admittedly unlicensed to drive.  *See id.*  Further, the officer had suspected that the initial driver was intoxicated, though he had passed a roadside sobriety test.  *See id.*  The court explained,

> we believe that [the officer] would have considered it necessary to determine whether the passenger who would ultimately be driving the van was impaired by alcohol-since, after all, Ryles had alcohol on his breath. Even assuming that he walked up to the driver's door and opened it without knocking, [the officer] would only have been attempting to assure that the van would be driven safely.

*Id.* at 15.  As such, the court concluded that the officer's conduct constituted a reasonable search under the Fourth Amendment, "even assuming he did intrude into the interior space of the van before smelling burnt marijuana."  *Id.* at 16.  The court stressed the "limited

nature" of its holding and emphasized, "We do not intend to suggest that a police officer may in all circumstances constitutionally intrude into the interior of a vehicle simply because he has temporarily lawfully detained the vehicle because of a traffic violation."  *Id.*

The Court is aware of only one case within this Circuit addressing this issue: *United States v. Baley*, 505 F. Supp. 3d 481, 500 (E.D. Pa. 2020).  In *Baley*, the defendant argued that marijuana odor and ashes could not be considered in the court's probable cause analysis because they were observed through an unconstitutional search of defendant's vehicle.  *Id.*  The officer in *Baley* conceded at a hearing that he "place[d] his head partially in the car, that he did so for investigatory purposes, and that he did not notice the smell of marijuana or see the ashes until his head was partially in the car."  *Id.* at 499.  Citing *Montes-Ramos*, the court declined to decide but assumed *arguendo* that the officer's partial physical intrusion into the car was a search unsupported by probable cause, and that its fruits must be ignored for purposes of determining whether there was probable cause for a subsequent search.  *Id.* at 500.  The court ultimately decided that probable cause existed for the subsequent search even without the evidence obtained by way of the officer's physical intrusion.  *Id.* at 501.

Defendant contends that Konopka "sticks his head deep into the open passenger-side window of the vehicle" at 1:39 on the MVR.  (Doc. 57 at 14.)  To the extent Defendant relies on this event as an unlawful search after which no occurrence can inform reasonable suspicion, he is mistaken.  A review of the MVR shows that Konopka is leaning against the

car with his head inclined toward the interior as he begins to tell Defendant the reason for

the stop, i.e., that his window tint was a violation of Pennsylvania law. (MVR at 1:25.)   It is

raining and a tractor trailer is passing the vehicle on the interstate.   Two more tractor trailers

and a passenger car pass before Konopka allegedly intruded into the vehicle. (MVR at 125-

139.)   At 1:39 on the MVR, Konopka momentarily leans his head slightly more into the

vehicle. (*See* MVR at 1:39-1:40.)   By 1:41 on the MVR, Konopka has returned to his earlier

posture and, thereafter, his posture changes periodically with no evidence that he is

conducting an interior search of the vehicle prior to 2:14 on the MVR, the earliest *Rodriguez*

moment established by the Court.   Importantly, it is a visual examination of the interior of the

vehicle which Defendant says is "a search within the meaning of the Fourth Amendment"

pursuant to the authority cited above (Doc. 57 at 15), and Defendant asserts only that a

visual search occurred at 2:27 on the MVR when Konopka "is seen conducting a visual

examination of the  vehicle with his head inside the interior space of the vehicle" (Doc. 57 at

14).   Therefore, the Court has no basis to conclude that Konopka unreasonably intruded

into the interior of Defendant's vehicle pursuant to *Class* and other cases upon which

Defendant relies.   Further, the Court need not decide whether Konopka conducted an

unlawful search of Defendant's vehicle when he is "seen conducting a visual examination of

the vehicle with his head inside the interior space of the vehicle" at 2:27 on the MVR (Doc.

57 at 14) because this event occurred *after* the *Rodriguez* moment established above and

nothing which occurred later in the stop informed the Court's analysis of reasonable suspicion.[10]

## IV. CONCLUSION

For the foregoing reasons, Defendant's "Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment to the United States Constitution" (Doc. 24) will be denied.  A separate Order follows.

Robert D. Mariani
United States District Judge

---

[10] Defendant specifically identifies two pieces of evidence that should not be considered because they were allegedly unlawfully observed: "the phlebotomy items stored in an allegedly unsanitary manner that caused the Trooper concern and work identification cards which caused the Trooper to disbelieve Mr. Rivera-Raposa's explanation."  (Doc. 57 at 15–16 n.4.)  This evidence did not inform the Court's reasonable suspicion analysis.